1
2
3
4                                                              **E-FILED on    5/23/08**
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT
9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                             SAN JOSE DIVISION
11
12
UNITED STATES OF AMERICA,              No. C-04-03340-RMW
13                                        No. C-06-06276-RMW
              Respondent/Plaintiff,
14                                        Related to CR-99-20092-RMW
      v.
15                                        ORDERS RE MOTIONS UNDER 28 U.S.C. §
CLIFFINA JOHNSON and FREDERICK L.         2255
16    SHIRLEY,
17            Movants/Defendants.
18

19        Movants/defendants Cliffina Johnson and Frederick Shirley seek summary judgment on their

20   motions under 28 U.S.C. § 2255 to vacate their convictions for conspiracy to bribe a public official

21   and bribery of a public official.  The United States has cross-moved to dismiss for lack of

22   jurisdiction and failure to state a claim for relief.  The motions have been extensively briefed and

23   orally argued.  The court hereby denies the motions.

24                            **I.  PROCEDURAL HISTORY**

25        On June 9, 1999 Johnson and Shirley were indicted for conspiracy to bribe a public official

26   (18 U.S.C. § 371) and bribery of a public official (18 U.S.C. § 201(b)(1)(C)) during the period

27   between March and July of 1998.  Guilty verdicts were rendered against both defendants on October

28   2, 2000 following a jury trial.  Shirley was sentenced on January 16, 2001 to incarceration for a term

1   of 14 months to be followed by three years of supervised release.  Johnson was sentenced on January

2   21, 2001 and received an identical sentence.  Both defendants filed notices of appeal.  Johnson's

3   conviction was affirmed on May 10, 2002 (*U.S. v. Johnson*, 34 Fed. Appx. 381 (9th Cir. 2002)).

4   Shirley apparently withdrew his appeal.

5          The primary witness against the defendants was Clarence Walker, then a revenue agent with

6   the IRS, who testified with respect to the defendants' activities leading up to Shirley's actual

7   payment to him of a bribe.  Walker was later discovered to have been involved in separate criminal

8   conduct and he was indicted and convicted of some of the charges against him.  Shirley and Johnson

9   contend that if they had been able to cross-examine Walker about this criminal activity at their trial

10  they would have been able to cast substantial doubt about his credibility.  The Government's alleged

11  failure to provide the defense with information about Walker's criminal conduct is the basis of the

12  movants' motions to set aside their convictions and sentences.

13         An investigation of Walker for suspected criminal conduct was commenced on June 27, 2001

14  based upon information received on June 25, 2001.  As a result of the investigation, Walker was

15  indicted on January 24, 2004 for: (1) conspiring from about September 18, 2000 through about

16  March 25, 2002 to aid another to evade currency transaction reporting requirements (18 U.S.C. §

17  371); (2) causing a domestic financial institution to fail to file currency transaction reports (31

18  U.S.C. §§ 5324(a)(1) and (d)(1)); (3) structuring a transaction so a domestic financial institution

19  could evade reporting requirements (31U.S.C. §§ 5324(a)(3)); and (4) bribery (18 U.S.C. §

20  201(b)(2)(B) & (C)).  Walker was convicted of the first two counts but the jury did not reach a

21  verdict on Counts (3) and (4).

22         Johnson apparently learned of Walker's indictment on June 26, 2004.  Shirley claims he did

23  not learn of Walker's indictment until October 11, 2005. However, the Government contends that

24  Shirley was advised of the indictment through his counsel in April 2004.

25                    **II.  MOVANTS' CLAIMS AND DEFENSES THERETO**

26         Shirley and Johnson assert the same two claims, specifically: (1) that there was a violation of

27  due process resulting from the failure of the Government to disclose materially impeaching evidence

28  about Walker; and (2) that there was a violation of due process by the Government's failure to

1    correct Walker's perjurious statements and material omissions during his testimony.  The

2    Government responds and seeks to dismiss Shirley and Johnson's motions based on essentially four

3    defenses: (1) Shirley's claim is barred as untimely; (2) Shirley's claim is based upon derivative

4    entrapment which is not a cognizable defense; (3) Johnson has no claim because she is no longer

5    under a criminal sentence; and (4) the Government has no obligation to produce *Brady*/*Giglio*

6    information which it did not possess and of which it was unaware during Shirley and Johnson's trial.

7    The Government also contends the evidence pertaining to Walker's acts of misconduct was not

8    material to movants' convictions.

9                                       **III. ANALYSIS**

10           **A.  Timeliness of Shirley's Claim**

11           The Government contends that Shirley's claims are untimely because they were not filed

12   within one year after the facts supporting the claims could have been discovered through the

13   exercise of due diligence.  Walker was indicted on June 26, 2004 and Shirley did not file his motion

14   until October 11, 2006.  Under 28 U.S.C. § 2255(4) a motion to set aside a conviction must be filed

15   within one year of "the date on which the facts supporting the claim or claims presented could have

16   been discovered through the exercise of due diligence."  The Government prosecutor claims he

17   spoke with Shirley's trial attorney in early 2005 and told him about Walker's indictment.  The

18   Government also claims that Walker's indictment received significant publicity and that Shirley's co-

19   defendant Johnson learned of the indictment from that publicity implying that Shirley should have

20   also.

21           Shirley claims that he first learned of Walker's indictment when he contacted the Federal

22   Public Defender's Office in the second week of October 2005 to inquire about getting time off his

23   supervised release term.  Shirley completed his federal sentence in March 2004 but then had to serve

24   a state sentence for a parole violation.  Shirley was released from state custody approximately

25   September 21, 2005.  Shirley declares that his only contact with his federal trial attorney after he

26   was sentenced concerned an issue of whether or not he had fully served his federal sentence.  He

27   contacted his attorney through his wife and did not speak with him directly.  He had no retainer

28   agreement with his attorney at this time and learned nothing about Walker's indictment.

1    Shirley's trial attorney declares that he never talked to the Government about Walker's
2    indictment.  He also states that his representation of Shirley in the subject federal case ended upon
3    Shirley's being sentenced in the case.  His only other involvement in the federal matter was a phone
4    call to the Government he made as a courtesy to his former client to see if his federal sentence had
5    been correctly calculated or could be shortened by one day.

6    The court concludes that Shirley cannot be said to have failed to use due diligence in
7    discovering the basis for his section 2255 motion because he had no reason to suspect that Walker
8    would be or had been indicted.  Shirley was incarcerated at the time the indictment was returned
9    and, therefore, did not have the access to news that he might otherwise have heard.  Even if his trial
10   attorney was informed of Walker's indictment, there is no evidence this information was passed on
11   to Shirley and, since that attorney no longer represented Shirley, the attorney's knowledge cannot be
12   attributed to Shirley.

13   **B.  Shirley's Claim Is Not Based upon Derivative Entrapment**

14   The Government contends that Shirley's motion is predicated on the theory that Shirley was
15   entrapped by other than a Government agent, specifically by Johnson.  In other words, Shirley is
16   now asserting a claim of derivative entrapment which is not a defense.  *United States v. Thickstun*,
17   110 F.3d 1394, 1399 (9th Cir. 1997).   "Derivative entrapment occurs when an entrapped individual
18   induces the defendant to commit a crime." *Id.*  However, Shirley is not claiming that he was
19   entrapped by Johnson but that he was entrapped by Walker.  The entrapment was accomplished,
20   according to Shirley, by Walker's threats of dire and untrue consequences that would befall to
21   Shirley if he did not agree to bribe Walker.  The contention that Walker allegedly used Johnson as a
22   conduit to deliver inducing information to Shirley does not make the case one of derivative
23   entrapment.  If the evidence supports Shirley's theory that he was unlawfully induced by Walker,
24   Shirley is correct that the Government's conduct constituted entrapment and not derivative
25   entrapment.

26   **C.  Johnson Has Standing to Assert Her Claim**

27   The Government argues that the court lacks jurisdiction to grant relief to Johnson because
28   she is no longer in custody.  The Government relies upon the language in section 2255 which

1   provides for potential relief only to "[a] prisoner in custody under sentence of a court" (28 U.S.C. §

2   2255) and *United States v. Kwan*, 407 F.3d 1005, 1009 (9th Cir. 2005)(motion under § 2255 may

3   only be filed by person in government custody).  There is no question but that a prisoner must be

4   under the restraint of a sentence in order to file a section 2255 motion.  But what the Government

5   overlooks is that the custody requirement is determined as of the date of filing.  In *Carafas v.*

6   *Lavalee*, the Supreme Court held that once jurisdiction has attached in the district court "it is not

7   defeated by the release of the petitioner prior to completion of the proceedings on such application."

8   391 U.S. 234, 237 (1998); *see United States v. Bryson*, 981 F.2d 720, 726 (4th Cir.1992); *see also*

9   *United States v. Hearst*, 638 F.2d 1190 (9th Cir. 1980).

10      Johnson filed her motion on August 16, 2004 when she was still serving her sentence.

11   Therefore, her motion was timely.  Further, she is still suffering collateral consequences of her

12   conviction such as the inability to vote.

13      **D.  The Government's *Brady/Giglio* Obligation Is Continuing**

14      The Government contends that it had no duty to turn over information concerning Walker's

15   wrongdoing because it did not learn of any of that information until June 25, 2001 at the earliest.

16   Johnson and Shirley had been sentenced in January 2001.  Therefore, the information was not

17   available for use at either the trial or sentencing.  *See Sanchez v. United States*, 50 F.3d 1448, 1453

18   (9th Cir. 1995) ("[W]e find that the government was not aware of the alleged *Brady* material.  The

19   Government has no obligation to produce information which it does not possess or of which it is

20   unaware.").  Johnson and Shirley respond by contending that the information that Walker knew

21   should be imputed to the Government.  If not, in the alternative, the Government at least had an

22   obligation to turn over the information when it first learned of it so that it could have been used in a

23   motion for a new trial.

24      Johnson and Shirley claim that Walker should be considered part of the prosecution thus

25   obligating the Government to turn over to the defense information concerning Walker's criminal

26   activities and lies during trial.  The defense's argument is predicated upon the fact that Walker was

27   part of the prosecution team because he worked for the agency investigating Shirley and he was a

28   key member of the prosecution.  Although Walker was a critical witness for the Government, the

1    court finds that he was not part of the prosecution for *Brady* purposes.  Walker was not a law

2    enforcement officer, nor was he responsible for making prosecutorial decisions with respect to

3    Johnson and Shirley.  The court has found no case suggesting that a *Brady* obligation arises when a

4    cooperating Government witness, who was employed by the Government, lies without the

5    knowledge of those prosecuting the case.  *See Sanchez*, 50 F.3d at 1453.  Therefore, the court finds

6    Walker's knowledge cannot be imputed to the Government thus triggering a *Brady* obligation.

7         Johnson and  Shirley's contention, however, that the Government had an obligation to turn

8    over the information it learned about Walker's criminal wrongdoing at the time it first learned about

9    that wrongdoing has merit.  In *Thomas v. Goldsmith*, 979 F.2d 746 (9th Cir. 1992) the court held that

10   a *Brady* obligation continues through post-trial proceedings.  At the time that the Government

11   learned of Walker's wrongdoing and lies, the information could have been used by the defense to

12   support a new trial motion under Fed. R. Crim. P. 33.  At that time, the defense still had ample time

13   to make a motion for new trial within the three-year limitation period.  *See Fed. R. Crim. P. 33(b)(1)*.

14        The Government correctly points out that in *Thomas*, the court only held that the continuing

15   duty to disclose applied in a post-trial habeas corpus proceeding and argues that *Thomas* should not

16   be read to suggest a blanket post-conviction obligation to disclose.  The Government further points

17   out that the information here was provided before the section 2255 motions were filed.  The

18   Government's argument, however, overlooks the fact that at the time the information was learned by

19   the Government, Shirley and Johnson could have made timely motions for a new trial.  Therefore,

20   the court finds that the Government had an obligation to inform Johnson and Shirley of the

21   information it learned about Walker's alleged wrongful conduct and lies when it first learned the

22   information so Johnson and  Shirley could have used that information as a basis for a motion for new

23   trial.

24        **E.  Materiality of the Failure to Disclose**

25             **1.  Definition and Test of Materiality**

26        The critical question is whether the failure to disclose the information about Walker was

27   material.  "[E]vidence impeaching the credibility of a key government witness, as well as

28   exculpatory to defense, falls under the *Brady* doctrine."  *United States v. Shaffer*, 789 F.2d 682, 687

(9th Cir.1986).   Failure to disclose information, however, only constitutes a *Brady* violation if the requested information is "material," that is, the evidence undermines confidence in the outcome of the trial.   *United States v. Bagley*, 473 U.S. 667, 678 (1985).

### 2.  Lack of Materiality of Impeachment Evidence As to Case Against Defendant Shirley

The Government asserts the failure to disclose the impeaching evidence concerning Walker was not material because tape-recorded evidence left no question as to Shirley's guilt.   Shirley relied at trial solely upon an entrapment defense.[1]   The evidence was undisputed that on April 28, 1998 Shirley paid $1,000 as an initial payment on a bribe to Walker to create phony IRS tax audit records clearing Shirley of his failure to file income tax returns for the years 1987-1996.   A videotape showed Shirley paying $6,000 in $100 bills on May 21, 1998 as additional payment of the bribe. Shirley did not testify at trial nor has he filed any declaration in these proceedings claiming he was entrapped.   Therefore, the question is whether the defendant Shirley's inability to test Walker's credibility by cross-examining Walker about his criminal conduct undermines confidence in Shirley's conviction.   Does it raise any reasonable likelihood that the jury was wrong in finding that Shirley was either pre-disposed to commit the crime of bribery or at least was not induced by government agents to do so?

The evidence about Walker is disturbing, particularly since the Government portrayed him as an ethical IRS Revenue Agent.   However, a review of the undisputed evidence leaves no reasonable doubt as to Shirley's guilt and that the inability to challenge Walker's credibility based upon the new evidence was harmless.   The critical conversations Walker had with Shirley were recorded.

On March 27, 1998 Walker and Shirley met for the first time.   Walker, Shirley and Johnson met at the Coleman Still restaurant (or according to Johnson the meeting was at the Cozy Inn) where Walker explained to Shirley what the tax notice he had received from the IRS meant, told Shirley that he faced serious allegations, warned Shirley of potential adverse consequences and advised that the IRS agent involved was very thorough.   Shirley expressed his dislike of the IRS agent and his

---

[1]If evidence of entrapment is offered, the burden is on the Government to prove beyond a reasonable doubt that the defendant was not entrapped.

1    frustration with the IRS and his problem.

2        At trial Johnson testified about specific statements that were on the tape of this March 27

3    meeting.

4        Q     And the three of you are having lunch?

5        A     Yes.

6        Q     And Fred is talking?

7        A     Yes.

8        Q     And you're participating in the conversation; isn't that right?

9        A     Yes.

10       Q     Okay. And this meeting—this is the first time that Clarence had met

11              Fred Shirley, as best you know; isn't that right?

             A     Yes.

12       Q     Okay.  Because you had introduced them; right?

13       A     Yes, I did.

14       Q     All right.  Now, at the very bottom of that page then, Fred Shirley

15              says, "I.R.S., I don't want any, this is just, that's all.  If I can help you

             with a car, I'll be more than happy.  It has nothing to do with you or

16              anything else.  Two Americans talking to each other.  Your badge is

             off right now."

17              Do you see that?

18       A     Yes, I do.

19       Q     Fred Shirley said that, didn't he?

20       A     Yes, he did.

21       Q     And when he meant "your badge is off right now," that indicated that

22              something about, that they were trying to hide something; isn't that

23              right?

             A     Yes.

24       Q     And, again, you introduced Fred Shirley; right?

25       A     Yes.

26       Q     And you— here we have a conversation about a car for some help;

27              isn't that right?

28       A     Yes.

| | | |
|---|---|---|
| 1 | Q | And there's no doubt in your mind, and tell these ladies and |
| 2 | | gentlemen, that that help that Fred Shirley was looking for was to help him with his audit; isn't that right? |
| 3 | A | Yes. |
| 4 | Q | Okay.  So while there may have been discussions about a Form 2807, |
| 5 | | there was also discussions about helping him with his audit; isn't that right? |
| 6 | A | Yes. |
| 7 | Q | And at that time when you hear that, you had no doubt in your mind |
| 8 | | that it was about helping him with his taxes; isn't that right? |
| | A | Yes. |
| 9 | Q | And you knew that the person auditing his taxes was Dan Sutherland; |
| 10 | | isn't that right? |
| 11 | A | Yes, I did. |
| 12 | Q | And what they were asking Clarence was that he should take over the |
| 13 | | file and fix his taxes; isn't that right? |
| | A | No. |
| 14 | Q | No? |
| 15 | A | No. |
| 16 | Q | Okay.  But you knew at the very least here that a car was being offered |
| 17 | | to Clarence; isn't that right? |
| 18 | A | Yes, it is. |

19  Trial transcript at 1267-68 ("Tr. at____").  Walker made no suggestion at the meeting that he would

20  fix Shirley's taxes or in any way solicit a bribe or intimate that a bribe should be offered to him.

21        Walker and Johnson testified to different versions of what happened between the March 27,

22  1998 meeting and April 28, 1998, when the parties met at the Coleman Still.  During this interim

23  period Johnson claims that Walker informed her that he was going to solicit a bribe from Shirley and

24  then insisted that she assist him in doing so.  She claimed that these discussions with her apparently

25  were not recorded and that Walker said he was going to charge Shirley $10,000.  Walker, on the

26  other hand, claimed that Johnson had suggested to him in early April that Shirley would pay a

27  $10,000 bribe.

28        Walker's next direct communication with Shirley took place on April 28, 1998 at the

Coleman Still restaurant.  Before Johnson arrived, Shirley specifically raised the question of Walker's doing something for him.

> FS (Fred Shirley):     I'm trying to do the best I can and be honorable about it but he's an asshole, pardon my French.  I told Tippy what I . . . this is hard. It's hard to approach it how the hell you help me this thing . . . .

4/28/98 Recorded conversation at 3 ("____ Rc. at _____").  Shirley shortly thereafter specifically raises the idea of the payment of money.

> FS:     Yeah.  Now, if there's anything you can do for me . . . here's what I was thinking.  Let's say that I could come up with some money.  I don't wanna give it to the IRS.
>
> CW (Clarence Walker):     Okay.
>
> FS:     Okay?  I'd rather give it to you for something you can do for me.  I don't know what you can do.  I don't know how you can do anything.  I don't know.
>
> CW:     Well what do you want me to do for you?
>
> FS:     Well what can you do for me?  Is there anything you can do for me?
>
> CW:     Well, you know more about your situ . . . I don't know anything about it.  I—
>
> FS:     I haven't really finished my situation yet, I guess.  They're still in the middle of auditing and—
>
> CW:     Okay, you said som'em about not giving the money to the IRS, you'd give it to me.
>
> FS:     Well yeah.  If you can do something for me, I'd rather give it to you than give it to the IRS, it's gonna be lost in the stream somewhere.
>
> CW:     I could get the file, that's . . . that can happen.

*Id.* at 13-14.  Discussion concerning Walker's ability to get Shirley's file followed and then Cliffina Johnson arrived and the conversation continued.

> CW:     Cause, uh, gettin' the file . . . damn . . . no problem in getting the file.  I'm just, like I was telling Cliff, "I'm not quite sure what Fred wants me to do."
>
> FS:     Here's what I was saying, Cliff, basically, is, you know, I can go out and borrow 10 or 20 grand, that, okay?  To help clear up this mess.
>
> CJ (Cliffina Johnson):     Mm-hmm.
>
> FS:     I just don't wanna throw it to the IRS, I'd rather give it to—

| | | |
|---|---|---|
| CJ: | Do what you gotta do. | |

CJ:  Do what you gotta do.

FS:  Just some help here.  I don't wanna . . . if I turn it over to them it's just gonna be swallowed up in the stream.  If he can get, maybe he'll inherit my file.  I don't know. . . I already told Mike, Mr. Jenkins.  I don't like Dan.

CJ:  Mm-hmm.

FS:  Uh, I can't deal with him.  I mean, he's really puttin' me down all the time and, you, raggin' on me.

CW:  Well the file could get transferred.

FS:  That's what I mean.

CW:  Yeah.

FS:  The file could get transferred.

CW:  Like I was telling Cliff yesterday, there's only two agents in the group that has a low inventory, and that's me and this other little girl.  Now Dan's gonna be going.  She's leaving Monday—next Monday on some training, okay, so that just leaves me.  Now don't worry about all the particulars on how to get the file or anything like that.  I'm just trying to figure out once I get the file, what do you want me to do with it.

*Id.* at 16.  Discussion then continued as to what Shirley's tax problem was and what Walker could do:

CW:  Okay.  Now, once I get the file, uh, I'm not sure you . . .. exactly—

FS:  Well I know you can't flush it down the toilet. (Laughs) I mean—,

* * *

FS:  But there's something that I can—how do I negotiate out of the deal with the IRS?—that's the next step.  I can go borrow some money (unintelligible) and I can say, okay, I'm gonna correct this, start over new and pay what I can pay; I mean, since it's all gonna be—

CW:  Well, you said you didn't wanna pay the IRS, you put down a dollar sign there.

FS:  Well I don't want to but I'm gonna have to, obviously, pay something, all right, Clarence, to make it—

CW:  You said you'd rather pay me.

FS:  I'd rather, yes.  Of course I would.

CW:  Well,—

FS:  (Unintelligible) absolutely.  (Laughs).

1    CJ:    I (Unintelligible), don't ask no questions.

2    FS:    Don't ask any questions.

3    CW:    So.—

4    CJ:    'Cause he knows what he's doin'.

5    FS:    Okay.

6    * * *

7    CW:    All right.  So, you are willing to pay me is what you're sayin'?

8    FS:    Yes.

9    CW:    To do what?

10   FS:    Well, actually, at this point, I really don't know, Clarence, I just wanna
        get out of the loop somehow—I . . . I don't really know.  I'm 60 years
11      old and I just wanna get . . . it's just too much 'cause I got a bad heart.

12   CW:    Oh, you know.  You just—

13   FS:    Well how do I get . . . how do I get out of the loop?  How do I get out
        of this damn thing?  You got the file that say I owe seventy grand
14      (unintelligible).  They came up with some figure I owe seventy
        thousand.

15   CW:    Like I said, the particulars you don't need to worry about.

16   * * *

17   CW:    Okay?  You said you'd rather pay me, than pay the IRS.

18   FS:    That's right.

19   CW:    Okay.  So, what exactly. . . what do you mean when you say pay me
20      rather than the IRS? (Phone ringing)

21   FS:    (Laughs) Okay.

22   CJ:    How much are you talking' about, are you considering?

23   * * *

24   FS:    Uh, so I can do 10 now and probably 10 later, and that's about all I can
        get.  Honestly.

25   CW:    Okay.  Do you . . . well are you gonna pay me ten thousand dollars
26      now is what you're sayin'?

27   FS:    No, not today, but I mean, as soon as we get this solved and

28   CW:    Oh.

1    FS:    Then ten later—

2    CW:    Well okay.

3    FS:    'Cause I can probably get 10 in another forty-five days.

4    CW:    Okay.  Okay.

5  *Id.* at 21.  Walker and Shirley then discussed the payment further and Walker confirmed the payment

6  was for him.

7    CW:    Now is this for me?

8    FS:    That's for you.

9    CW:    What about—

10   FS:    She gets—

11   CJ:    That car?

12   FS:    She has to get a car . . . she gets a car down the road, I guess,
            somewhere.

13 *Id.* at 28.  The parties then discuss what Walker will do and when the actual payment of the bribe

14 will be made.  Shirley then concludes the discussion by offering Walker a free vacation in Hawaii.

15   FS:    When this is all said and done I am gonna send you to Hawaii, you
16          gotta go to spend some time in Hawaii for a week in my friend's condo
            over there.  Take the bird and fly over, you and your wife.

17   CW:    Shoot, I can't afford a ticket to Hawaii.

18   FS:    Zero.

19   CW:    Huh?

20   FS:    Gratis.  A friend of mine.  No problem.

21   CW:    Oh, really?

22   FS:    Absolutely.

23   CW:    How are you gonna arrange that?

24   FS:    Are you kidding?  I'm a Hawaii (unintelligible).  I can arrange
25          anything over there, it's my homeland.  I call up and say, "Let a friend
            of mine come into your condo," no problem.
26                  CW:    No, but I mean, the airfare and all that.

27   FS:    Handled.  Senior vice-president of Brazilian Airlines is one of my best
            friends from high school and college.  He just trades out a few tickets
28          to Hawaiian Air, too.  Fly Hawaiian Air.

CW:   Oh, really?

FS:   Of course.

CW:   See, I don't know nothin' about that stuff.

FS:   Just loving people and knowing each other.  Now that's som'en I gotta throw in for you.  I want you to have a week to Hawaii.

CW:   Okay.

*Id.* at 74.

These recorded conversations strongly support the conclusion that Shirley initiated the idea of bribing Walker to get rid of his, Shirley's, tax problem.  The conversation about a car on March 27, 1998 took place before Johnson even claims that Walker spoke to her about asking for a bribe from Shirley.  Nevertheless, in their motions both Shirley and Johnson contend that Walker came up with the bribe idea and then pressured Johnson to suggest the idea to Shirley.  It is difficult to read the above excerpts and accept that contention.  However, more importantly, the contention does not square with Johnson's trial testimony. Johnson did testify that the idea of a cash payment was Walker's and that Walker got her to agree to persuade Shirley to pay a $10,000 bribe.  She testified that Walker first mentioned in late March that he was going to charge Shirley but Walker had laughed when he said it so she did not take him seriously.  Tr. at 1213:1-13.  Thereafter, Walker mentioned to her on April 2 and 9 that he was going to charge Shirley but he again laughed when he said so.  However, on April 14 at a chance meeting between Walker and Johnson, Johnson testified that Walker told her he was serious.  *Id.* at 1213:15-1217:11.  Johnson claims that Walker thereafter pressured her into agreeing to ask Shirley to pay Walker a fee.  Both movants cite page 1230 of the trial transcript as supporting the claim that Johnson then conveyed Walker's fee to Shirley.  Johnson's testimony, however, does not support that claim.  When asked at trial about a statement she made in a recorded conversation with Walker on April 27, she testified:

Q    When you say, "but I'll ask him, though, before you get there, I'll ask him," what are you saying there?
A       I'll ask him how much he wants to pay Clarence.

Q    Okay, and why did you agree to do that?

A    Because I was pressured.

*Id.* at 1230:3-9. However, Johnson expressly denied that after agreeing to ask Shirley she did so.

| | | |
|---|---|---|
| Q | And how long did the 14th encounter take? | |

Q    And how long did the 14th encounter take?

A    Just a couple of minutes.

Q    And then the meeting with—the next meeting with Mr. Shirley happens on the 28th; right?

A    Yes.

Q    Okay. Now between the 14th of April and the 28th when you had the meeting, of April, did you call Fred Shirley?

A    If I recall, once or twice just to confirm that we going to be meeting on the 28th. That's about all. But that's it.

Q    Did you tell him what Clarence Walker had told you on the 2nd or on the 9th or on the 14th?

A    No. I couldn't. I couldn't do it. I couldn't tell Fred that.

Q    What did you tell Fred?

A    I didn't tell Fred nothing. I just told him to meet us there on the 28th. I couldn't tell him.

*Id.* at 1217:10-1218:2. Therefore, even if Walker had told Johnson that he was going to ask for a bribe, there is no evidence that Shirley was told that Walker was going to ask for a bribe prior to Shirley's suggesting he would pay one both before and after Johnson joined them in his meeting on April 28 with Walker at the Coleman Still restaurant.

Shirley also argues that Walker's advice to Shirley as to the dire consequences he faced as a result of his tax problem induced Shirley to pay a bribe. However, accepting for discussion that Johnson had asked Walker to meet with Shirley only for the purpose of explaining the notice that Shirley had received from the IRS, it appears that Shirley clearly had a severe tax problem and that what Walker told him was, at least in large part, true. Shirley has not offered evidence that Walker's advice was materially wrong and thus wrongfully induced Shirley to offer a bribe.

The court concludes that the fact that the potentially impeaching evidence concerning Walker was not available to Shirley at his trial does not undermine confidence in the correctness of the jury's verdict finding him guilty.

1

### 3.   Lack of Materiality of Impeachment Evidence As to Case Against Defendant Johnson

2

Johnson was entrapped if she was not predisposed to commit the crimes of which she was

3

convicted before being contacted by Walker and if she was induced by Walker to commit those

4

crimes.  The jury necessarily found that the Government proved beyond a reasonable doubt that she

5

was not entrapped.  The question now is whether there is a reasonable probability that, had the

6

newly discovered impeaching evidence of Walker's criminal acts been disclosed, the result of the

7

trial against Johnson would have been different.  Having carefully reviewed the evidence, the court

8

concludes that it would not have been.

9

The only evidence of inducement was Johnson's testimony that Walker came up with the

10

plan to charge Shirley and that Walker then pressured Johnson into agreeing to ask Shirley how

11

much he would pay.  "Inducement is any government conduct creating a substantial risk that an

12

otherwise law-abiding citizen would commit an offense." *United States v. Sandoval-Mendoza*, 472

13

F.3d 645, 648 (9th Cir. 2006)(internal quotations omitted).  The mere suggestion to commit a crime,

14

however, does not amount to inducement. *United States v. Mendoza-Prado*, 314 F.3d 1099, 1102

15

(9th Cir. 2002).  Here, although Johnson claims she was pressured into participating, the

16

circumstances make that claim difficult to accept.  Although persuasion by itself can result in

17

entrapment (*see United States v. Gurolla*, 333 F3d 944, 954 (9th Cir. 2003)), the evidence shows no

18

sound basis for concluding that Walker's alleged pressure would have created a substantial risk that

19

an otherwise law-abiding citizen would have committed the offenses.  Johnson had been offered no

20

money or other benefit for her participation at the time she claims to have yielded to Walker's

21

pressure.  Walker had made no threats nor taken any coercive action against Johnson. The evidence

22

provides no rational explanation why a law-abiding citizen, even assuming the facts as claimed by

23

Johnson, would have felt pressured to participate in a bribery scheme.

24

Johnson's claim that she participated because of Walker's pressure, and that she was not

25

predisposed to commit the crimes, is inconsistent with the evidence.

26

> In evaluating predisposition, we consider five factors: (1) the defendant's character
> and reputation; (2) whether the government initially suggested criminal activity; (3)
> whether the defendant engaged in the activity for profit; (4) whether the defendant
> showed any reluctance; and (5) the nature of the government's inducement.  Although

27

28

none of these five factors controls, the most important is the defendant's reluctance to engage in criminal activity.

*United States v. Tucker*, 133 F.3d 1208, 1217 (9th Cir. 1998) (internal quotation marks and citations omitted).  The nature of the alleged inducement of Johnson, if any, and Johnson's apparent lack of reluctance are shown by the evidence previously discussed.  Two additional pieces of evidence relating to Johnson's character show that she had a willingness to do illegal acts for money.  On March 18, 1998, a date before Johnson claims that Walker said anything about seeking a bribe, Johnson told Walker about charging for helping a tax payer with an offer-in-compromise.

CW:   Oh is that that uh, what do you call that thing, uh . . .

CJ:   Offer in Compromise?

CW:   Yeah.

CJ:   (Unintelligible).

CW:   Oh he's . . .

CJ:   Tha's is all he wanted.

CW:   Did you, what, did you get him one?

CJ:   Yes (Unintelligible) already did it.

CW:   It went through?

CJ:   Uh huh.  He didn't have much.  I didn't have nothing to do with that. That the RO's Job.

CW:   Oh.  The RO did it for you?

CJ:   I gave him the form, the Offer in Compromise form?

CW:   Yeah.

CJ:   I brought it down there to him.  And explained how to fill it out.

        (Unintelligible)

CW:   Charged you how much?

CJ:   I only charged him a hundred twenty-five dollars.

CW:   Oh you charged him?

CJ:   Uh huh, you know damn well I did.  You think I do it for free?

3/18/98 Rec. at 15-16.[2]  Then on April 27, 1998 in a meeting between Johnson and Walker, Johnson

expressed her determination to personally get some of the money from Shirley.

> CW:   He's got to tell me what he wants done, cause uh, I'm not going to
>        volunteer anything for him.  No . . . (Unintelligible) got to be the one
>        shit get off the pot.
>
> CJ:    Um hmmm.
>
> CW:    You know, you tell him one thing, and uh, and he asked me to do
>        something different, and then it don't turn out.
>
> CJ:    Um mmmm.  No . . . I wouldn't do that, I wouldn't go that way.  I
>        wouldn't go that way.  I want the bastard's money.
>
> CW:    Huh?
>
> CJ:    I want his money.  I want his money.
>
> CW:    You want his money?
>
> CJ:    Um hmmm.

4/17/98 Rec. at 13.

        If Johnson is believed, Walker made the initial suggestion of a cash payment for fixing

Shirley's tax problem.  Nevertheless, it was Johnson who arranged the original contact between

Shirley and Walker.  Johnson brought Shirley into contact with Walker because Shirley had a tax

problem.  Before Johnson claims that Walker pressured her to assist him in getting a bribe from

Shirley, she had told Walker in a March 18, 1998 conversation that Shirley would give Walker a car

in exchange for his help.

> C J:   . . . . He said well hell Cliff if he could just help me out I'll give him
>        the car.  I said you didn't give me one yet.  He said no if he can help me out
>        I'll give him a car.  I said (Unintelligible), come on now.  He said no this
>        man's on my ass I want to get him off my ass, that's all.
>
> CW:    You talking about, Dan?
>
> CJ:    Yeah.  Just let me talk with him that's all, cause he (Unintelligible).
>
> CW:    Well like, see I don't, I don't know what exactly Fred will want me to
>        do . . .

---

[2]Johnson testified at trial that she did not actually charge for offers in compromise and that her
statement to Walker was a lie.

1  3/18/98 Rec. at 19-20.  The evidence that Johnson was induced to commit her crimes and was not

2  predisposed to engage in the criminal activity is minimal at best.  The weight of the evidence

3  strongly suggests that Johnson was not reluctant to engage in criminal activity.  The newly

4  discovered potentially impeaching evidence of Walker, although disturbing, does not undermine the

5  court's confidence in the correctness of Johnson's conviction.

6  ### III.  ORDER

7  The motions of Johnson and Shirley for relief under 28 U.S.C. § 2255 are denied.

8

9  Dated: _____5/23/08_____

10

11  _____
   RONALD M. WHYTE

12  United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Copy of Order mailed on _____5/27/08_____ to:**

2

Cliffina Johnson
745 Dutton Ave.

3

San Leandro, CA 94577

4

**Notice of this document has been electronically sent to:**

5

**Counsel for Cliffina Johnson:**

6

Lupe Martinez                martinez-luna@sbcglobal.net

7

**Counsel for Frederick Shirley:**

8

Lupe Martinez                martinez-luna@sbcglobal.net

9

**Counsel for United States of America:**

10

Carlos Singh                 carlos.singh@usdoj.gov

11

12

13

Counsel are responsible for distributing copies of this document to co-counsel that have not

14

registered for e-filing under the court's CM/ECF program.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDERS RE MOTIONS UNDER 28 U.S.C. § 2255
NO. C-04-03340-RMW
NO. C-06-06276-RMW                                    20